494 F.Supp.2d 1067 (2007)
FEDERAL TRADE COMMISSION, Plaintiff,
v.
Richard C. NEISWONGER, et. al., Defendants.
No. 4:96CV2225SNL.
United States District Court, E.D. Missouri, Eastern Division.
April 23, 2007.
*1068 *1069 Gary Owen Caris, Lesley Anne Hawes, McKenna and Long, Los Angeles, CA, Gerald P. Greiman, Erik O. Solverud, Spencer and Fane, LLP, St. Louis, MO, for Robb Evans & Associates LLC, (Receiver).
Melinda Claybaugh, Joshua S. Millard, Federal Trade Commission, Washington, DC, Larissa L. Bungo, Virginia A. Davidson, Gerald C. Zeman, Fed. Trade Com'n, Cleveland, OH, for Federal Trade Commission, (Plaintiff).
Randall K. Edwands, Randall K. Edwards, PLLC, Salt Lake City, UT, US, Attorney to be Noticed, for Charles C. Nope, (Movant).
Leonard J. Frankel, Frankel and Rubin, Clayton, MO, Lead Attorney, Attorney to be Noticed, for William S. Reed, (Defendant).
Robert T. McAllister, Robert T. McAllister, P.C., Denver, CO, US, Attorney to be Noticed, for Richard C. Neiswonger, (Defendant).
Michael J. Roessner, U.S. Department of Justice, Washington, DC, Lead Attorney, Attorney to be Noticed, for United States, (Intervenor Plaintiff).
Michael Singer, Las Vegas, NV, US, Lead Attorney, Attorney to be Noticed, for Pepper Financial Corporation, (Movant).

MEMORANDUM OPINION
LIMBAUGH, Senior District Judge.
Plaintiff Federal Trade Commission (FTC) has filed this civil contempt action against defendant Richard C. Neiswonger, contempt defendant William S. Reed, and contempt defendant Asset Protection Group, Inc. (APGI) contending that the defendants have violated a 1997 Permanent Injunction by marketing and selling a training and business program with misrepresentations and by failing to disclose material facts to a large number of consumers. The FTC further alleges that *1070 defendant Neiswonger, individually, violated the 1997 Permanent Injunction by failing to provide a current performance bond to the FTC and to notify the FTC of his affiliation with defendant APGI. A hearing was conducted on October 25 and 26, 2006 to address the two primary issues present in this civil contempt action: 1) the FTC's desire to modify the 1997 Permanent Injunction as to defendant Neiswonger; and 2) the FTC's desire to have the Court find defendant Neiswonger, contempt defendant Reed, and contempt defendant APGI in civil contempt for violating the 1997 Permanent Injunction.[1] At the conclusion of the hearing, all interested parties were permitted to file post hearing briefs. Furthermore, following the hearing on the civil contempt matter as to the 1997 Permanent Injunction, the Receiver filed a motion requesting that the Court make a separate ruling finding contempt defendant Reed in contempt for violating the provisions of a temporary restraining order (TRO) that this Court entered on July 17, 2006. See, Court Order # 29. Contempt defendant Reed has filed a response to this additional. motion for contempt as it relates to the alleged violation of the July 17, 2006 TRO. All substantive matters relating to this civil contempt action have been fully briefed, and the matter is now ripe for disposition.
After careful consideration of all objections to exhibits and testimony taken with the case, all said objections are hereby overruled, and all exhibits offered into evidence at the hearing are received into evidence.[2] All testimony will be considered by the Court and given its due weight. This Court, having now considered the pleadings, the testimony of witnesses, documents in evidence, and any other evidentiary materials submitted for the Court's consideration, and being fully advised in the premises, enters its findings and final disposition of this matter.

Background[3]
Plaintiff, the FTC, is a federal law enforcement agency created by Congress, 15 U.S.C. §§ 41 et. seq., charged with enforcing Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.
In 1996, defendant Neiswonger was involved, along with others, in a business venture known as Medical Recovery Systems, Inc. The FTC filed a complaint against Neiswonger, charging him and others with marketing training and business programs with false and misleading income claims, among other deceptive practices, *1071 in violation of Section 5(a) of the FTC Act.[4] Specifically, the FTC alleged that Neiswonger was deceptively marketing business training programs for upwards of $10,000.00 that purportedly equipped members of the general public to become well-paid business consultants in the areas of finance and expense reduction, among other things. Some of the alleged deceptive practices were Neiswonger's claims that consumers who purchased these programs were likely to earn sixfigure incomes from fees generated using the programs, when in actuality, such incomes were rarely (if ever) achieved. Neiswonger also allegedly urged potential clients to speak with named "references" before purchasing the program(s), without disclosing that said "references" were paid to provide a positive (if not profitable) picture of the success of the program(s).
After filing the complaint, Neiswonger and his co-defendants stipulated to the entry of a Permanent Injunction (hereinafter referred to as the 1997 Permanent Injunction), which is the subject of this current litigation.
After Neiswonger signed the 1997 Permanent Injunction and paid $425,000.00 in redress to the FTC, the United States Department of Justice charged him with financial crimes relating to the program(s) which were the subject of the FTC's 1996 civil lawsuit.[5] In September 1998, Neiswonger pled guilty to one (1) count of wire fraud and two (2) counts of money laundering. United States District Court Judge Rodney W. Sippel sentenced Neiswonger to eighteen (18) months in a federal penitentiary and further ordered restitution in the amount of $2,750,000.00 to the consumer victims.
As he was preparing to enter federal prison to serve his term of imprisonment, on or about October 23, 1998, Neiswonger joined contempt defendant Reed in constituting the first Board of Directors of contempt defendant APGI.
Defendant Neiswonger subsequently entered federal prison to serve his term of incarceration. Thereafter, the Justice Department initiated civil forfeiture action(s) against him, charging that he failed to disclose approximately $1,300,000.00 in illicit proceeds to the authorities during plea negotiations in his criminal case. Neiswonger ultimately forfeited $750,000.00 in settlement of the government's forfeiture proceedings.
Contempt defendant William Reed and defendant Neiswonger have been business partners for many years prior to the present action. Reed is a former Colorado attorney whose license to practice was suspended by the Supreme Court of the State of Colorado in 1997 for "engag[ing] in misrepresentations and dishonesty".[6] In addition to joint business ventures with defendant Neiswonger, contempt defendant Reed has written a book entitled "Bulletproof Asset Protection (2004)" which advises the reader of methods by which to "hide" their assets from potential creditors, government agencies, receivers, and the courts.
Contempt defendant APGI is a Nevada corporation created in late 1998 by defendant Neiswonger and contempt defendant Reed. From 1999 to mid-2006, APGI offered and sold a training and business opportunity program (the "APGI Program") to consumers nationwide. The APGI Program was marketed and sold as *1072 an "assets protection" program wherein consumers who purchased the program became APGI "asset protection consultants". They, in turn, would presumably sell APGI "asset protection services" to clients wishing to conceal assets from potential litigants and creditors, government agencies, and the courts. APGI "asset protection consultants" presumably would receive a portion of the fees paid by clients who purchased APGI's services.
APGI's "asset protection services" involved the sale and use of Nevada corporations that employed APGI's services as a resident agent. APGI also sold services related to the formation and maintenance of offshore international business companies ("IBCs"). APGI "asset protection consultants" not only received a portion of the fees paid by clients who purchased APGI's services, including the Nevada corporations and IBCs sold; but also, presumably received payments for the annual renewal of these corporations by said clients.

Defendant Neiswonger and APGI
Defendant Neiswonger actively participated in marketing and promoting the APGI Program. He personally promoted the program to potential "asset protection consultants" in person and by telephone. Neiswonger's name, statements attributed to him, and signature all appear in APG promotional materials for the APG Program. Neiswonger served as a Director of APG in 1998 and 1999.[7] He then served as APGI's Marketing Director. From 1998 to 2006, he additionally served as an agent of APGI.
For a time, Neiswonger used an entity called APGI Marketing, Inc. to assist in the marketing of the APGI Program. According to the Receiver's Report (FTC's Exhibit 112), APGI Marketing, Inc. was a fictitious division of contempt defendant APGI. APGI internal documents do not distinguish between the two business entities. See, FTC's Exhibits 51, 105.

Contempt Defendant Reed and APGI
Contempt defendant Reed served as APGI's Director and President from late 1999 until mid-July 2006. Reed actively participated in promoting and marketing the APGI program along with Neiswonger. Reed's name, picture, statements attributed to him, and his signature all appear in APGI promotional materials. He also promoted the APGI Program via phone and other means. Reed reviewed and approved the development and final versions of most promotional materials for APGI. See, Neiswonger Deposition, pgs. 94, 179, 207.

Contempt Defendant APGI's Operation
Contempt defendant APGI was marketed throughout the United States via printed advertisements in various publications, mailed promotional letters, and interstate phone calls between APGI agents and prospective consumer purchasers. Via print ads, APGI solicited potential purchasers of the APGI Program with the promise of a substantial income in a "lucrative business". FTC Exhibit 13 and 14. Such persons were then invited to call a number to get more information. Consumers who called the advertised phone number got a recording requesting that they leave their mailing address for receipt of an "introductory package". This "introductory package" included a video describing the advantages of Nevada and offshore business corporations in general, as well as a "Special Free Report" signed by Neiswonger and containing statements from Neiswonger and Reed describing the APGI Program. FTC Exhibit 6; FTC Exhibit 15. The highlights of the "Special Free Report" include (but are not limited to) Neiswonger's *1073 exaltation of the "overwhelming" demand for APG's services, Reed's account of how he gave up his law practice to develop APGI's "unique business system" which could easily provide anyone working the program part-time with an income of "more than $90,000", and touting the benefits of Nevada and offshore business corporations. Potential buyers are again invited to call APGI for additional information.
When consumers called for additional information, APGI personnel would again reiterate the claims made in the introductory materials. They would provide consumers with the names of "references"; i.e., purportedly active APGI consultants who would corroborate these claims. The references were paid to recommend APGI but this fact was not normally disclosed to the consumer nor the amount paid to the reference for the positive spin put on APGI to the inquiring consumer. See, FTC Exhibits 33, 36, 37, 38, 40, 41, 42 (consumers' declarations); see also, FTC Exhibits 7, 9, 11, 14, 16-20, 23-24 (transcripts of recorded phone calls between FTC investigators posing as consumers and APGI personnel verbal sales pitches).
These contacts often next lead to a direct solicitation from defendant Neiswonger extolling the virtues of the APGI Program and additional promotional letters from Neiswonger and Reed. Ultimately, if a consumer elected to purchase the APGI Program for approximately $9800.00; she received training materials, access to a one-day "training session" and a business affiliation with APGI as an "asset protection consultant". FTC Exhibit 6.

(Mis)representations re APGI
Consistently throughout APGI's written promotional materials are statements attributed to Reed and Neiswonger, including but not limited to:
1) that prospective purchasers of the APGI Program did not need prior experience in sales, management, or professional businesses to be successful APGI consultants (FTC Exhibits 6, 15);
2) that a "6-figure income potential" was obtainable on a part-time schedule (FTC Exhibits 6, 42C, 42D);
3) acquiring 6-8 clients in a single month was a "VERY reasonable, very achievable goal" (FTC Exhibit 10, 38; see also, FTC Exhibits 15, 64 speaking to the ease of obtaining clients);
4) that APGI was a business opportunity that could "generate a substantial income"; "a true $250,000 + + + yearly income" (FTC Exhibit 63);
5) promising prospective purchasers that "$350,000 + First year potential income. Part or full time. Unique products with no competition." (FTC Exhibit 65);
The vast number of written representations throughout the marketing and promotional materials regarding the APGI Program as a "lucrative business" and likely incomes as "substantial" or "six-figure" were convincing to a significant number of consumers and relied upon by these same consumers to purchase the program.
In the promotional materials, Reed and Neiswonger attempted to "disclaim" their representations regarding income potential and ease of obtaining clients by placing such statements infrequently in the materials, using small print-type, and then "disclaiming" the disclaimers. For example, near the end of the "Special Free Report", Neiswonger states that APGI "do[es] not guarantee any specific or certain income, nor should you consider any of the examples used . . . as projections of your income. Individual results may vary." FTC Exhibit 6. He then goes on to state that "your income will depend on your initiative, time and effort invested . . . and other factors over which we have no control." FTC Exhibit 6. However, he immediately *1074 negates the impact of this disclaimer by stating "You can certainly see, however, at a profit of $1,700 to $6,400 per client served, it takes only a small number of clients each year to create a very substantial income." FTC Exhibit 6. Another example is Reed states in another APGI promotional sales letter that a first year consultant, working part-time, can earn $114,000 selling a certain ratio of Nevada and Bahamas corporations to clients. FTC Exhibit 36B. He follows this assertion by disclaiming this six-figure income claim "as a mathematical example only". FTC Exhibit 36B. However, he too immediately negates this disclaimer by stating that "Our current experience is that the ratio is actually much more favorable that our example." FTC Exhibit 36B.
A particularly effective representation by the defendants consisted of an advertisement featuring an APGI consultant named Barbara Black who purportedly had "absolutely no sales background" and made a "six-figure" income in her first year as an APGI consultant. FTC Exhibit 64. The defendants failed to inform prospective purchasers that 1) Ms. Black had been supplied with numerous names of prospective clients prepared to buy corporations (see, FTC Exhibit 105; Neiswonger Deposition, pgs. 124); 2) that Ms. Black was the only person out of nearly 2000 APGI consultants to have obtained a "six-figure" income at any time from the APGI Program; and 3) Ms. Black obtained this level of income for only two (2) years. See, FTC Exhibit 64, 105.
Numerous verbal representations were made to prospective purchasers regarding the likelihood of earning a "substantial income" or "six-figure" income from fees generated by using the APGI Program Neiswonger repeatedly referred to a "sixfigure" income when speaking directly to potential purchasers. The APGI "references" verbally corroborated written statements regarding the earning potential for "six-figure" incomes. Consumer declarations verify that the defendants repeatedly told consumers that they were likely to earn a "substantial income" or "six-figure" income from working as APGI consultants.

Factual Findings based on Receiver's Report and APGI Records
Nearly two thousand (2000) consumers bought the APGI Program and became APGI consultants. FTC Exhibit 112. However, according to APGI's business records, only three (3) consultants, in a period of over six (6) years, succeeded in selling more than fifty (50) corporations in total. FTC Exhibit 119. A majority of APGI consultants failed to sell any corporations. FTC Exhibits 112, 113, 119.
The Receiver, upon review and analysis of APGI's records, found that the vast majority of APGI consultants actually lost money. The Receiver estimated that approximately 94% of the consultants failed to earn back their initial purchase fee for the program. Several of these consultants testified at the hearing as to their monetary losses and/or inability to earn an income that anywhere near the "six-figure" income represented multiple times to them by the defendants. The Receiver's findings corroborated the testimony of the consultant witnesses regarding little or no sales. Using APGI's own database, the Receiver ranked the listed APGI consultants by the number of corporations they sold, and concluded that the median number of corporations sold was zero (0). See, FTC Exhibit 113; Receiver's Hearing Testimony.
Neither defendant Neiswonger nor contempt defendant Reed disputed the Receiver's findings at the hearing. Neither party presented any evidence of consumer satisfaction or documentary evidence of actual income of APGI consultants.
Contempt defendant Reed put the number of APGI consultants, during the relevant *1075 timeperiod, at approximately 400. FTC Exhibit 18. However, State of Nevada corporate records show that APGI has provided resident agent services for nearly 3200 Nevada corporations since 1998; thus, at best, each of the 400 consultants only sold eight (8) corporations during his/ her relationship with APGI. FTC Exhibit 26. Furthermore, as of the time of the initiation of this lawsuit, nearly 50% of the 3200 corporations listing APGI as their resident agent are defunct; i.e., failed to renew their corporate status. Thus, APGI consultants not only failed to earn "substantial income" based upon fees generated by the initial corporation, such income was nearly impossible for the majority based upon lack of renewals.

Material Facts Not Disclosed to Consumers
As stated before, the material fact that fees were paid to "references" supplied by the defendants was not disclosed to consumers. APGI paid references $50.00 for each initial phone call they accepted from a prospective purchaser of the APGI Program. FTC Exhibits 101, 105, 112; see also, FTC Exhibits 6, 8, 10, 20, 22, 23, 25, 26, 36. Some references by accepting several phone calls monthly earned anywhere from $1000 to $3000. FTC Exhibit 105; Neiswonger Testimony (October 26, 2006).
Representations were made to consumers that APGI's "proprietary strategic alliance" with a telemarketing firm, would provide consumers with appointments with carefully-screened "qualified prospective clients". FTC. Exhibit 6. However, in actuality, APGI consultants paid thousands of dollars for these "appointments" to a succession of telemarketing firms recommended by APGI, only to find that their "appointments" were no more than "coldcalls" with persons who either had simply wanted general information or had no idea what APGI was or why the telephone call, or in some cases, a personal visit. FTC Exhibits 34, 37, 39, 40, 42.
Neiswonger's prior criminal convictions in connection with the marketing of two (2) prior business opportunity programs were not disclosed to prospective buyers of the APGI Program. Contempt Defendant Reed's law license suspension was not disclosed to prospective buyers of the APGI Program. See, FTC Exhibits 6, 20, 21, 23, 36, 40.

Miscellaneous Violations of the 1997 Permanent Injunction
Defendant Neiswonger failed to provide the FTC with proof of a current performance bond while marketing and selling the APGI Program.[8] Although he apparently secured a performance bond in 1997 for another business enterprise,[9] however, there is no evidence that he ever notified the FTC about that bond or any bond secured in connection with the marketing and selling of the APGI Program. FTC Exhibit 116.
Neiswonger and Reed formed APGI's first Board of Directors in late 1998. Neiswonger did not report to the FTC, in writing, his new business affiliation.[10] FTC Exhibits 1, 2, 27.

APGI's Profits
The Receiver found records at APGI's place of business evidencing the defendants' *1076 gross sales of the APGI Program and the income and expenses attributed to that program. FTC Exhibit 112; Miller Testimony (Receiver's Representative)(October 26, 2006 Hearing). These records were kept in electronic format by Neiswonger using Quicken, a well-recognized computer software for financial recordkeeping. Said records were located on Neiswonger's office computer and preserved by the Receiver's staff. The records generated a written report of income and expenses on July 20, 2006. FTC Exhibit 118; Miller Testimony. The report accurately represented APGI's financial status as of July 19, 2006.
The Receiver also found financial records evidencing the defendants' income attributed to the sale of the APGI Program on the office computer of APGI Vice-President Kimberly Toy. These records also were made in the Quicken format, on a regular basis, near or at the time of the transactions. Again, once retrieved, they were preserved by the Receiver's staff. Based upon these records, as well as the records retrieved from Neiswonger's computer, the Receiver's staff was able to generate a current computation of the defendants' income from the sale of the APG Program.
APG's records indicate that, between January 2000 and July 2006, the defendants generated income of a approximately $19,854,937.64 from the sale of the APGI Program. These records indicate gross sales began in 2000 and for a period of five (5) years, from 2001 to 2005, the recorded gross sales for the APGI Program were in excess of $3,000.000.00 per year. FTC Exhibit 118; Miller Testimony.
Neiswonger took the income of APGI to pay his personal expenses for a period of six (6) years; logging these expenses as "personal" in corporate accounting records. FTC Exhibits 114, 118. Although Neiswonger recorded $2,802,371.19 in personal expenses in his expense records; the Receiver found the total payments made to, or on behalf of, Neiswonger from the proceeds of the sales of the APGI Program to be in excess of $3,000,000.00 dollars.[11] FTC Exhibit 114; Miller Testimony. These payments included, but were not limited to, personal credit card payments, as well as payments on Mercedes-Benz and Lexus automobiles. FTC Exhibit 114.
The Receiver's investigation revealed that contempt defendant Reed also derived a substantial income from the sales of the APGI Program. Using the records obtained from Neiswonger and Toy's office computers, the Receiver was able to ascertain that Reed made $1,223,195.78 in cash withdrawals, and that payments to other business entities controlled by Reed for "training" totaled $3,688,861.13. The Receiver concluded that with the cash withdrawals, the payments for "training", and other miscellaneous payments to himself or for his benefit, Reed received approximately $5,000,000.00 from the sales of the APGI Program. FTC Exhibit 114; Miller Testimony.[12]

*1077 Contempt Defendant Reed's Notice of the 1997 Permanent Injunction

Defendant Neiswonger testified that he commtnicated to Reed several times both the requirements of the 1997 Permanent Injunction and the need to comply with it. FTC Exhibit 105  Neiswonger Deposition, pgs 49-50, 253. Reed himself acknowledged the existence of the 1997 Permanent Injunction via conversations with Neiswonger. FTC Exhibit 104  Reed Deposition, pgs. 15-16. He was aware that the injunction existed and that Neiswonger had to abide by several provisions if he were to enter into a new business affiliation. Id. In 2004, an APGI consultant complained to Reed about Neiswonger's background and showed Reed a copy of the FTC's original complaint in this case. Pianga Testimony (October 25, 2006 Hearing). Reed also received other complaints regarding Neiswonger's background and this FTC litigation in 2005. FTC Exhibits 84,110. Reed personally responded to the complainants referencing Neiswonger's "problems with the FTC" and court orders. FTC Exhibit 111; Hammond Testimony (October 25, 2006 Hearing).

Relevant Provisions of the 1997 Permanent Injunction[13]
The FTC has alleged that defendant Neiswonger and contempt defendants Reed and APGI violated Paragraphs I, I.A., II, and `IIA. of the 1997 Permanent Injunction; and furthermore, defendant Neiswonger has violated Paragraphs V and XI of said Injunction.
Paragraph I of the Injunction prohibits, defendant Neiswonger, and all others in active concert or participation with him who receive actual notice of the Order, from misrepresenting any material fact in connection with advertising, promoting, marketing, selling, or otherwise inducing participation in any program. Prohibited misrepresentations include, but are not limited to, claims that consumers will earn a six-figure income, or words of similar import, from client fees generated from any program. The 1997 Permanent Injunction prohibits any misrepresentation of material facts in connection with advertising, promoting, marketing, selling or otherwise inducing participation in any program, regardless of whether such misrepresentations are made directly or by implication.
Paragraphs I and II.A. require Neiswonger, and all others in active concert or participation with him who receive actual notice of the Order, to affirmatively disclose all material facts to prospective purchasers of any program. Material facts include, but are not expressly limited to "the amount of enumeration or any other benefit received by each reference whose name is provided to the prospective purchaser". The. Injunction requires the advance disclosure of all material facts to prospective purchasers in connection with advertising, promoting, selling or otherwise inducing participation in any program.
Paragraph V of the 1997 Permanent Injunction prohibits defendant Neiswonger from marketing or selling any program without first providing the FTC with written proof of a current performance bond before commencing marketing activities.
Paragraph XI of the 1997 Permanent Injunction requires defendant Neiswonger to report to the FTC, in writing, any new business affiliation with any program for a period of three (3) years, commencing in 1997.

Application and Modification of 1997 Permanent Injunction as to Defendants
This Court has jurisdiction over this matter for all purposes, as reserved and *1078 stipulated to, in Paragraph XIII of the 1997 Permanent Injunction. Moreover, pursuant to Rule 65(d) Federal Rules of Civil Procedure, injunctions are binding on all parties to the action, as well as "those persons in active concert or participation with them who receive actual notice of the order by personal service on otherwise."
As a party to the original litigation in this matter, and a signatory to the 1997 Permanent Injunction, there is no dispute that said Injunction applies to defendant Neiswonger.
Normally, the Court would address any factual or legal issues before reaching a decision regarding the applicability of the subject injunction to Neiswonger; however, it appears that he has conceded its applicability. Although he presented a limited defense at the hearing; mostly consisting of disputing semantics, he chose not to file a post-hearing legal brief of "findings of fact and conclusions of law". Instead, he filed a "Proposed Permanent Injunction" which concedes certain violations of the 1997 Permanent Injunction and seeks to modify the FTC's proposed amended 1997 Permanent Injunction.[14] Thus, this Court finds that there is no dispute that defendant Neiswonger has violated the provisions of the 1997 Permanent Injunction.[15]
As to contempt defendants Reed and APGI, Inc., it is their contention that this Court lacks jurisdiction over them because they were not signatories to the 1997 Permanent Injunction nor does credible evidence exist that they had "actual notice" of the subject injunction and its applicability to Neiswonger. Upon careful consideration of the matter, the Court finds that the contempt defendants Reed and APGI, Inc. did have actual notice of the 1997 Permanent Injunction and its applicability to Neiswonger; thus, pursuant to Rule 65(d) Fed.R.Civ.P., this Court has jurisdiction over them in the matter presently pending before the Court.
In their motion to dismiss,[16] the contempt defendants Reed and APGI, Inc. (referred periodically as APGI) argue that the FTC has failed to allege sufficient facts *1079 showing that either contempt defendant had actual knowledge of the 1997 Permanent Injunction and its applicability to Neiswonger or that either contempt defendant was in active concert with Neiswonger (in violating the terms of the 1997 Permanent Injunction).
Rule 65(d) Fed.R.Civ.P. provides:
(d) Form and Scope of Injunction or Restraining Order. Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable de tail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice, of the order by personal service or otherwise.
Firstly, contempt defendant Reed contends that the FTC has failed to allege that he had specific knowledge regarding the terms of the subject injunction and/or failed to allege that he had actual knowledge of the specific terms of the subject injunction. He argues that the FTC has not met its burden because its evidence on this issue is circumstantial; i.e. generalities based upon his business relationship with defendant Neiswonger. The Court finds defendant Reed's argument meritless.
After careful consideration of the evidence before the Court, the Court finds that defendant Reed received actual notice of the subject injunction as required by Rule 65(d).
Personal service is not required under Rule 65(d). All that is required is knowledge of the mere existence of the injunction; not its precise terms. See, Hill v. United States, 33 F.2d 489, 491 (8th Cir. 1929). Furthermore, direct evidence is not required to sustain the FTC's burden of showing actual notice. "[F]or the reason that knowledge, like any other fact, may be established by circumstantial evidence . . .". Hill, at 491. Circumstantial evidence establishing "actual knowledge" may be derived from the parties' relationship, concert of action in maintenance of the unlawful business, and "the obvious interest of the defendants in evading any interference with their unlawful business as long as possible". Hill, at 491. In the present case, Neiswonger testified he told Reed of the requirements of the Permanent Injunction and the need to comply with same; that he discussed the "order" with Reed several times; and Reed's own testimony of his understanding that Neiswonger had to abide by certain restrictions regarding future business practices.[17] Furthermore, on more than one (1) occasion APGI consultants brought to Reed's attention the initial FTC action, even providing him with the case number and a copy of the original complaint. Reed is a former attorney knowledgeable of civil remedies, including injunctive relief. The fact that he may never had seen Document # 12 is immaterial. He was aware of an "order" restricting Neiswonger's participation in any future selling of financial *1080 programs, and he was aware of the FTC's action against Neiswonger. He and Neiswonger had been business partners for many years, and even remained in contact while Neiswonger was in prison. He had access to any and all documentation regarding this FTC litigation. Consequently, given Reed's business relationship with Neiswonger, the fact he was an attorney, the fact that Neiswonger communicated to him several times regarding the Court's enjoinment of Neiswonger's further business practices, the Court concludes that it was "highly improbable" that Reed was unaware of the existence of the subject injunction. See, Hill, at 491 ("These and other circumstances indicated to the trial judge, and indicate to us, that it was so highly improbable that these defendants did not know of this injunction as to make a finding that they did know proper."). It is this Court's considered opinion that defendant Neiswonger and contempt defendant Reed, given all the circumstances, had not overlooked the 1997 Permanent Injunction, "but that the purpose and intent of all the defendants was to disregard it." Hill, at 491.[18]
Secondly, the Court finds that contempt defendants Reed and APGI, Inc. acted in concert or participation with defendant Neiswonger. The evidence sufficiently established that Reed directly reviewed and approved promotional materials for the APGI Program. His name, photograph, personal statements, and signature were widely used in promotional and sales materials for the APGI Program. He personally spoke with prospective consumers about the APGI Program. He and Neiswonger were members of the Board of Directors for APGI, Inc. Reed was President and Director of APGI from 1998 through 2006; Neiswonger was APGI's agent and Marketing Director from 1998 to 2006. The Court finds that the evidence adduced shows that Reed and Neiswonger, together, ran APGI, Inc.
APGI acted in concert or participation with defendant Neiswonger in advertising, marketing, promoting, and selling the APGI Program. Although at one time, Neiswonger created a fictitious division of APGI, Inc. known as "APGI Marketing", this entity and APGI, Inc. were indistinguishable in promoting and selling the APGI Program.
The evidence sufficiently shows that contempt defendants Reed and APGI, Inc.'s interests closely identify with the interests of defendant Neiswonger, and that they all stood in privity with one another in marketing, advertising, promoting, and/or selling the APGI Program. See, Thompson v. Freeman, 648 F.2d 1144, 1147 (8th Cir. 1981).
The evidence before the Court clearly supports its determination that contempt defendants Reed and APGI, Inc. were subject to the 1997 Permanent Injunction during the relevant time-period. Thus, the Court will deny the contempt defendants' motion to dismiss.

Contempt Order
In order to establish the defendants' liability for civil contempt, the FTC bears the initial burden of showing, with clear and convincing evidence, that 1) there is a specific and definite order of this Court; and 2) the defendants have violated that order. See, Chicago Truck Drivers v. Brotherhood Labor Leasing, 207 F.3d 500, 505 (8th Cir.2000); Independent Federation of Flight Attendants v. Cooper, 134 F.3d 917, 920 (8th Cir.1998). Once the FTC has met its burden, the burden of *1081 proof is shifted to the defendants to show an inability to comply. Chicago Truck Drivers, at 506 citing United States v. Rylander, 460 U.S. 752, 757, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983)(a mere "present inability to comply" is a defense to civil contempt). In order to establish a defense of "inability to comply", the defendants must 1) show that they were unable to comply by explaining why "categorically and in detail", Chicago Truck Drivers, at 506 quoting FTC v. Affordable Media, 179 F.3d 1228, 1234 (9th Cir.1999); 2) show that their inability to comply was not "selfinduced", Chicago Truck Drivers, at 506 quoting In re Power Recovery Systems, Inc., 950 F.2d 798, 803 (1st Cir.1991); and 3) show that they made "in good faith all reasonable efforts to comply", Chicago Truck Drivers, at 506 quoting Commodity Futures Trading Commission v. Wellington Precious Metals, Inc., 950 F.2d, 1525, 1529 (11th Cir.), cert. denied, 506 U.S. 819, 113 S.Ct. 66, 121 L.Ed:2d 33 (1992).
No one disputes that the 1997 Permanent Injunction is a "specific and definite order" of this Court. The only dispute is whether the defendants have violated that order.
As for defendant Neiswonger, there really is no question that he has violated several provisions of the 1997 Permanent Injunction. In fact, he has conceded that he has done so by filing for the Court's perusal his own modifications to the 1997 Permanent Injunction. See, Defendants' Proposed Permanent Injunction (# 83, Exhibits A and B), filed November 8, 2006. At the hearing, Neiswonger attempted to. "minimize" his violations by pointing out the small type disclaimers in some of the promotional materials, by asserting that most of the consumers were satisfied with the APGI Program, and that refunds have been provided to those who have complained. None of these assertions form the basis for a proper defense to a civil contempt action. He has failed to present any evidence which either explains or details why he failed to comply with the provisions of the 1997 Permanent Injunction. On the other hand, the evidence was more than sufficient to show that he misrepresented to potential buyers of the APGI Program that they were likely to earn a "substantial income" or a "six-figure income" from client fees generated using the APGI Program (violation of Section I and I.A.); he failed to inform said potential buyers the fact that "references" received enumeration(s) for their positive feedback or the amount of enumeration (violation of Section II.A.); he failed to disclose material facts regarding his criminal-history in connection with the sales and marketing practices of another "program", as well as the material facts regarding the suspension of Reed's law license in Colorado (violation of Section II); he failed to provide proof of a current performance bond while marketing the APGI Program (violation of Section V); and he failed to report his business affiliation with APGI to the FTC for a three (3) year period, commencing in 1997 (violation of Section XI).[19] The Court finds that defendant Neiswonger is in contempt for his several violations of the 1997 Permanent Injunction.
As for Reed and APGI, Inc., the Court finds again that the evidence before it clearly establishes that Reed and APGI, Inc., by acting in concert and/or participating with defendant Neiswonger in engaging in prohibited activity regarding the advertising, marketing, promoting, and selling of the APGI Program, violated Sections I, I.A., II, and II.A. of the 1997 *1082 Permanent Injunction. Neither Reed nor APGI, Inc. offered evidence explaining or detailing their inability to comply with the subject injunction. They offered no evidence of any "good faith reasonable efforts" to comply with the subject injunction.
Having found that Reed and APGI, Inc. had actual notice of the 1997 Permanent Injunction, that they acted in active concert and/or participation with defendant Neiswonger in carrying out the prohibited activities, and finally, that they offer no evidence of any inability to comply with the subject injunction, the Court finds that defendants Reed and APGI, Inc. are in contempt for violating the provisions of the 1997 Permanent Injunction.
Having found that defendants Neiswonger, Reed, and APGI, Inc. are in contempt for violating the 1997 Permanent Injunction, the Court will grant the FTC's motion for a civil contempt order (# 22). Said order is attached as Exhibit 1 to this memorandum opinion.[20]

Modification of the 1997 Permanent Injunction
The FTC has requested that, upon a finding of contempt against defendant Neiswonger, the FTC requests that the Court enter an order modifying the 1997 Permanent Injunction. See, Court Document # 72. In response to the FTC's request, defendant Neiswonger filed his own version of a modified 1997 Permanent Injunction. This Court has the authority to modify the subject injunction pursuant to Rule 60(b) which provides that a court may modify its orders for any reason justifying relief from the operation of the judgment. Rule 60(b)(6) Fed.R.Civ.P. Moreover, the Court has the "inherent jurisdiction in the exercise of its equitable discretion and subject to appropriate appellate review to vacate or modify its injunctions." Jenkins v. State of Missouri, 931 F.2d 470, 482 (8th Cir.1991). This power to modify injunctive relief specifically extends to the modification of consent decrees. United States v. United Shoe Machinery Corp., 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968); United States v. Swift & Co., 286 U.S. 106, 114, 52 S.Ct. 460, 76 L.Ed. 999 (1932). Finally, this Court specifically retained jurisdiction and authority to modify the subject injunction pursuant to Section VII of the 1997 Permanent Injunction. Section VII of said injunction grants this Court the authority to permanently ban Neiswonger from advertising, promoting, offering for sale, or selling any program if he is found to have used any misrepresentations in the marketing or sale of programs, in violation of Section I of the Permanent Injunction.
As stated before, defendant Neiswonger has conceded that he violated one or more of the provisions of the 1997 Permanent Injunction. He offers for the Court's perusal a version of a modified permanent injunction which is "acceptable to the Defendants". The defendants proffered modified permanent injunction *1083 makes four (4) significant changes to the FTC's proposed revision: 1) allowing refunds to consumers up to the total amount of $140,000.00 (an amount allegedly frozen in an APGI Marketing, Inc. bank account); 2) lifting the freeze on bank accounts controlled by APGI, Inc. and/or defendant Reed; 3) terminating/dismissing the Receiver; and 4) prohibiting Neiswonger from any further operation of APGI Marketing or sale of Nevada corporations. Upon review of the defendants' proposed revisions to the FTC proposed revisions of the 1997 Permanent Injunction, the Court finds the defendants' proposal unacceptable.
Firstly, the evidence before the Court establishes that $140,000.00 would be a drop in the bucket in rectifying the situation perpetrated by the defendants' fraudulent conduct. Almost 2000 people paid approximately $10,000 apiece for the APGI Program due to the defendants' fraudulent misrepresentations." Moreover, defendants Neiswonger and Reed profited by approximately $8 million from their misdeeds. The defendants' monetary proposal of reimbursement to these consumers of only $140,000.00 is grossly inadequate to remedy the harm done by the defendants' fraudulent conduct.
Secondly, the evidence clearly shows this Court that these defendants would in all probability, absent an asset freeze and/or supervision of the Receiver, liquidate the bank accounts which this Court and the Receiver believe hold assets belonging to the defrauded consumers.[21] The defendants proudly advertised and enticed consumers into buying the APGI Program with their proclaimed expertise in hiding assets from not only individuals, but government agencies and the courts. Both Neiswonger and Reed have a history of fraudulent conduct in the handling of other peoples' financial assets. It is this Court's considered opinion that the freeze is necessary and the Receiver continue his investigation until all assets connected to this litigation can be ascertained for purposes of effectuating complete monetary relief to those who have been harmed by the defendants' conduct.
Thirdly, this Court's considered opinion is that Neiswonger should not be banned only from further involvement with APGI Marketing, Inc. but from the promotion, advertising, marketing, selling, etc. of all programs in order to protect the public. His history of fraud and criminal conviction relating to the promotion of another "get rich" program and his admission of failing to comply with the provisions of the 1997 Permanent Injunction (especially the prohibitions as contained in Section I) convinces this Court that he will repeat his fraudulent activities unless significantly curtailed. This is not a surprise to him; he stipulated to Section VII of the 1997 Permanent Injunction which provides:
"IT IS FURTHER STIPULATED AND ORDERED that if, upon motion by the Commission, the Court finds that defendant Richard C. Neiswonger has violated any of the prohibitions contained in Section I of the Order then, in addition to' any othersanctions the Court may deem appropriate, defendant `Neiswonger shall be permanently banned from the advertising, promotion, offering for sale or sale of any program." (emphasis added).
FTC Exhibit 1, pg. 9
The Court further notes that defendants have changed the definition of "program" *1084 as contained in the 1997 Permanent Injunction to cover only the "APGI Program". Given defendant Neiswonger's recidivist behavior and the overwhelming evidence that APG Marketing played a very small role in the overall fraud scheme related to the APG Program, such a change is meaningless.[22]
Looking at the total picture, and considering all evidence before this Court, this Court finds that pursuant to Section VII of the 1997 Permanent Injunction, this Court shall ban defendant Neiswonger from marketing and selling business opportunity programs in the future, and that such ban shall now consist additionally to telemarketing of such programs.
Additionally, given the extensive evidence of Neiswonger's violation(s) of the 1997 Permanent Injunction's compliancemonitoring provisions in perpetrating the APGI Program scheme, and given that some of these provisions have time-lapsed, the Court shall adopt enhanced compliance-monitoring provisions to prevent Neiswonger from violating (again) the provisions of the Permanent Injunction and to protect the consumer public at large.
Having considered the FTC's proposed second permanent injunction modifying the permanent injunction as to defendant Neiswonger (# 72), the Court finds same to be acceptable and reasonable in carrying out the Court's findings, and in effectuating the Court's contempt order. The FTC's proposed second permanent injunction shall be entered as the Court's second permanent injunction and attached to this Memorandum Opinion as Exhibit 2.
Finally, as to defendants Reed and APGI, Inc. it is this Court's Considered opinion that in light of the Court's finding of contempt as to each of these defendants in acting in active concert or participation with defendant Neiswonger in perpetuating the APGI Program fraudulent scheme, such defendants should also be subject to a permanent injunction relating to the advertising, promoting, marketing, and/or sale of any program. In this regard, the Court will set for a show cause hearing as to why defendants Reed and APGI, Inc. should not be subject to a permanent injunction such as the one being applied to defendant Neiswonger.

The Receiver's Contempt Application as to Defendant Reed
The Receiver has filed an application for an order of contempt against contempt defendant Reed for his post-receivership actions as being in violation of the TRO entered by this Court on July 17, 2006. Section III.A. of the TRO (# 29) enjoined Reed, as a contempt defendant in this case; from directly or indirectly transferring, converting, concealing, dissipating, disbursing, spending or otherwise disposing of any assets owned or controlled directly or indirectly by a contempt defendant, in whole or in part, or owned controlled by, or in actual constructive possession of any corporation or other entity directly or indirectly owned, managed, or controlled by a contempt defendant, including any assets held by, for or under the name of any contempt defendant in any bank. This prohibition was also applicable to contempt defendant APGI, Inc. Section III.F. of the TRO (# 29) further enjoined Reed from cashing any checks from consumers for programs *1085 or asset protection products or services, or any combination thereof.
Pursuant to Section V of the TRO, Robb Evans was appointed the Receiver for APGI and any other affiliated business entities that APGI controlled, with the full powers of an equity receiver. Pursuant to Section VI of the TRO, the Receiver was directed and authorized to assume full control of APGI, to take exclusive control, custody, and possession of all assets and documents of, or in the possession, custody or under the control of APGI, and to conserve, hold and manage all receivership assets and perform all acts necessary or advisable to preserve the value of those assets.
Section VII of the TRO required Reed to deliver to the Receiver possession and custody of all funds, assets and property of APGI, wherever situated, all funds and other assets belonging to members of the public now held by APGI, and all information identifying the accounts and assets of APGI. Section IX of the TRO enjoined Reed from directly or indirectly transacting any of the business of APGI, transferring, liquidating or otherwise disposing of any assets owned, controlled or in the possession or custody of, or in which an interest is held or claimed by, APGI. Section IX also enjoined Reed from doing any act whatsoever to interfere with the Receiver's taking and keeping custody, control, possession or management of the assets subject to the receivership or to harass or interfere with the Receiver in any way or to interfere in any manner with the exclusive jurisdiction of the Court over the assets of APGI.
In order to facilitate an orderly continuation of business, the Receiver determined that one aspect of the business of APGI could continue, under certain restrictions, without losing money and without violating the TRO and applicable laws. Upon Reed's request, the Receiver determined that APGI could continue to offer three (3) basic services to its customers: 1) renewal of existing corporations to keep them in good standing for fees ranging from $585 to $1395; 2) formation of new corporations for clients at the request of consultants for $795 to $1995, plus state filing fees; and 3) accepting funds from clients for transfer into the client's separate corporate bank accounts. Document # 72  Miller Declaration.
In making this determination, the Receiver drafted his Proposal for Restricted Business Operations of the Receivership Defendants pending the Show Cause Hearing. See, Declaration of M. Val Miller (attached to Document # 45, filed July 28, 2006). The Proposal specifically provided that the Receiver would retain the services of four (4) former APGI employees that were present when the Receiver took control of APGI.[23] None of these retained employees had signing or binding authority. All decisions and the execution of documents and transactions were to be conducted under the direct supervision and control of a deputy to the Receiver, i.e., M. Val Miller, Aaron Lancaster, and/or Aqua Porter. The Receiver was to open a bank account to serve as the operational account of APGI's ongoing business operations and only the Receiver had signatory authority on that account. The Receiver allowed the deposit of client funds into this new bank account and would transfer the client funds to the clients' separate bank account, only after the Receiver conducted thorough due diligence on the source of the funds sufficient to confirm that the funds were neither unlawful nor improperly obtained. Miller Declaration.
Reed was to fully cooperate with the Receiver and his deputies and was not to *1086 maintain an office at APGI's premises. Reed met with the Receiver and reviewed the subject Proposal for Business Operations; he understood its terms and agreed to abide by them. Miller Declaration. Upon submission to the Court, said Proposal was approved and on July 31, 2006, this Court entered its Restricted Operations Order granting the Receiver's Restricted Business Operations Proposal. Document # 48.
It is the Receiver's contention that Reed has violated the terms of the TRO and Restricted Business Operations order by transferring monies without the Receiver's knowledge or permission, opening bank accounts without the Receiver's knowledge or permission, transferred funds without the Receiver's knowledge or permission, and routed funds intended for APGI to a post-receivership account in the name of A Plus Group, Inc.[24] Furthermore, the Receiver contends that Reed has set up false offshore corporations for which he charged APGI's consultants $1995 without the Receiver's knowledge and permission.
The Receiver has supported his allegations with overwhelming evidence of these improper transactions. In response, Reed has filed an "affidavit"[25] in which he largely ignores the voluminous filing/declarations of the Receiver and instead argues that because he was following the instructions of Toy, Roy or Rowley, he "presumed" that the Receiver was knowledgeable of his actions. Furthermore, his "affidavit" directly contravenes significant testimony he gave at his deposition. For example, he states that the "offshore documents" found in APGI's offices were nothing more than "training tools"; yet at his deposition, he testified to setting up at least one (1) offshore Bahamian corporation post-receivership. Furthermore, he fails to deny that the offshore documents were found in APGI's clients' files. Miller's Declaration. He does not deny that at least eighteen (18) post-receivership accounts were opened at the Bank of Nevada without the Receiver's knowledge or permission. He doesn't deny setting up a corporate bank account post-receivership for A Plus Group, Inc., depositing APGI's clients' funds into this account, then withdrawing said funds. Finally, he doesn't deny that at his deposition he testified that he converted clients' funds by using counter checks obtained at the Bank of Nevada to purchase money orders at clients' requests, then mailed same to clients. However, he doesn't deny that this testimony was false because no client requested that he do this for them. Miller Declaration.
Essentially, Reed's response/"affidavit" is nothing more than his attempt to camouflage his post-receivership actions by asserting "presumed knowledge" on the part of the Receiver and/or citing one or two instances when he believes he acted in accordance with the TRO and/or Restricted Operations Order.[26]
*1087 The Receiver has set forth and proved, by clear and convincing evidence, that Reed repeatedly violated the TRO and Restricted Business Operations Order as entered by this Court. Reed had actual notice of both orders. Furthermore, Reed has failed to provide sufficient evidence of his inability to comply with the Court's orders. His violations are undisputed and thus, the Court finds defendant Reed to be in contempt of this Court's TRO, as entered on July 17, 2006 and the Restricted Business Operations order, as entered by this Court on July 28, 2006.
Having found that defendant Reed has failed to show cause as to why this Court should not hold him in contempt, and upon a finding of contempt, the Court will order that: 1) that Reed provide a full, complete and accurate accounting to the Receiver, under penalty of perjury, of all financial transactions which Reed has been involved with in any manner since inception of the receivership estate and which in any way relate to or pertain to APGI or any of its clients, customers or consultants or any funds which at any time have been held, owned or controlled directly or indirectly by APGI or any of its clients or consultants; 2) that Reed return to the Receiver all funds misappropriated by Reed from APGI or from any client, customer or consultant of APGI since inception of the receivership estate (as determined by the Receiver); 3) that Reed pay to the Receiver on behalf of the receivership estate, from sources other than receivership property, an amount to be determined by the Court representing the receivership fees and costs and the attorneys' fees and costs incurred by the Receiver in connection with this contempt application; and 4) any other relief this Court deems appropriate.
It is this Court's considered opinion that its findings are sufficiently supported by the evidentiary record, and that the steps taken by this Court are necessary and appropriate in order to protect the consumer public and to allow the Receiver to continue his work so as to ascertain the complete and accurate status of the receivership estate so that full monetary relief can be obtained for those who have been harmed by the fraudulent conduct of these defendants.

ORDER
In accordance with the memorandum opinion filed herein this date,
IT IS HEREBY ORDERED that the findings of fact and conclusions of law as set forth in the memorandum opinion are SUSTAINED, ADOPTED, and INCORPORATED herein.
IT IS FURTHER ORDERED that the Civil Contempt Order (marked as Exhibit 1 to this Order) shall be in full force and effect until further order of this Court.
IT IS FURTHER ORDERED that the Second Permanent Injunction Modifying Permanent Injunction as to Defendant Neiswonger (marked as Exhibit 2 to this Order) shall be in full force and effect until further order of this Court.
IT IS FURTHER ORDERED that this Court finds defendant William S. Reed in contempt for violations, as set forth in the Memorandum Opinion, of the Court's TRO, as entered on July, 17, 2006.
*1088 IT IS FURTHER ORDERED that having found defendant Reed in contempt for post-hearing violations of the afore-referenced TRO, defendant Reed shall: 1) provide a full, complete and accurate accounting to the Receiver, under penalty of perjury, of all financial transactions which Reed has been involved with in any manner since inception of the receivership estate and which in any way relate to or pertain to APGI (Asset Protection Group, Inc.) or any of its clients, customers, or consultants or any funds which at any time have been held, owned or controlled directly or indirectly by APGI or any of its clients or consultants; 2) return to the Receiver all funds misappropriated by Reed from APGI or from any client, customer or consultant of APGI since inception of the receivership estate (as determined by the Receiver); 3) pay to the Receiver on behalf of the receivership estate, from sources other than receivership property, an amount to be determined by the Court representing the receivership fees and costs and the attorneys' fees and costs incurred by the Receiver in connection with this contempt application; and 4) provide any other relief this Court deems appropriate. Defendant Reed shall provide the afore-referenced relief, except for the Receiver's costs and attendant attorneys' fees and costs, on or before May 25, 2007. No extensions of time shall be granted except for good cause shown.
IT IS FURTHER ORDERED that the Receiver shall file with the Court its accounting of the receivership fees and costs, as Well as the attorneys' fees and costs, incurred in connection with the matter of its contempt application against defendant Reed. The Receiver shall file said accounting on or before May 15, 2007. Any objections shall be filed no later than May 25, 2007. The Receiver may file a reply to any filed objections no later than June 4, 2007. As of June 5, 2007 the Court will consider this matter ripe for disposition.
IT IS FURTHER ORDERED that the Receiver shall file, on or before May 25, 2007, a final accounting of defendants Neiswonger and Reed's proceeds each obtained from the advertising, marketing, promotion, and sales of the APGI Program. See, Footnote # 20 of the Memorandum Opinion. Upon the filing of this final accounting, the Court will amend said Contempt Order (Exhibit 1 to this Order) to include an appropriate monetary sanction.
IT IS FINALLY ORDERED that having found that defendants Reed and APGI were in active concert and/or participated in the violations of the 1997 Permanent Injunction, as set forth in the Memorandum Opinion, and having considered all the evidence before the Court, and believing that these defendants will continue to perpetrate further frauds in connection with the advertising, marketing, promotion, and sales of the APGI Program and/or other similar programs, the Court will hold a show cause hearing as to why these defendants should not be specifically subject to a similar permanent injunction as the one now adjudicated with respect to defendant Neiswonger. The show cause hearing as to a permanent injunction against defendants Reed and APGI shall be on June 25, 2007 at 9:30 a.m. All interested parties may file pre-hearing briefs, witness list, and/or exhibit list no later than June 18, 2007.

EXHIBIT 1

CIVIL CONTEMPT ORDER
WHEREAS, on February 28, 1997, this Court entered a Stipulated Final Judgment and Order for Permanent Injunction and Other Equitable Relief (Permanent Injunction) containing, among other things injunctions proscribing misrepresentations and omissions of material fact in the advertising, marketing, and sale of programs *1089 by defendants and all other persons or entities acting in concert or in participation with them with actual notice of the Permanent Injunction, `as well as certain reporting and performance bond requirements applicable to individual defendants under specific circumstances, as set forth in paragraphs I., II., V. and XI. of that order, and
WHEREAS plaintiff, the Federal Trade Commission (Commission or FTC), has filed a motion, with a supporting memorandum, pleadings, and exhibits, seeking to hold defendant Richard C. Neiswonger (Neiswonger) and two persons or entities with notice of the Permanent Injunction in active concert or participation with him. Contempt defendants William S. Reed (Reed) and Asset Protection Group, Inc. (APG), (all three, collectively, Contempt Defendants), in civil contempt for violations of the Permanent Injunction; and
WHEREAS this Court has fully considered the Commission's motion and supporting papers, as well as the full record, and applicable case and statutory law, and has concluded that contempt defendants are in civil contempt, the Court now finds as follows:
1. Contempt defendants received actual notice of this Court's Final Judgment and Order for Permanent Injunction and Other Equitable Relief (Permanent Injunction or Order).
2. Contempt defendants have acted in concert and in participation with defendant Neiswonger in the advertising, marketing, promotion and/or sale of a program as defined in the Permanent Injunction and herein, specifically including a training session, course of instruction, class material, affiliation, association, period of support, or combination thereof.
3. The evidence indicates that contempt defendants' acts and practices in connection with the advertising, marketing, promotion, and/or sale of a program violate paragraphs I and I.A as well as paragraphs II and IIA of the Permanent Injunction. These violations have occurred since at least May 2002.
4. The evidence further indicates that defendant Neiswonger has also violated paragraph V of the Permanent Injunction relating to providing the Commission with proof of a current $100,000 performance bond. That order violation has occurred since at least May 2004.
5. The Court finds defendant Richard C. Neiswonger and contempt defendants William S. Reed and Asset Protection Group, Inc., in civil contempt of its Final Judgment and Order for Permanent Injunction, and deems it necessary to issue the present Order to coerce compliance with the Permanent Injunction.
6. Entry of this order is in the public interest.
7. This action and the relief awarded herein are in addition to, and not in lieu of, other remedies as may be provided by law, including both civil and criminal remedies.

DEFINITIONS
For the purposes of this order, the following definitions apply:
A. "Contempt Defendants" means Richard C. Neiswonger, William S. Reed and Asset Protection Group, Inc., and each of them, individually and jointly, and their successors, assigns, officers, agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, whether acting directly or through any entity, corporation, subsidiary, division or other device.
B. "Permanent Injunction" means this Court's Stipulation Final Judgment and Order for Permanent Injunction and Other *1090 Equitable Relief, entered on February 28, 1997.
C. As used in the above findings, "Program" means any training session, course of instruction, class material, computer software, affiliation, association, newsletter, period of support, joint venture opportunity or combination thereof advertised, marketed, offered or sold by any of the Contempt Defendants.

I.
IT IS FURTHER ORDERED that there is no just reason for delay of entry of this Order, and, pursuant to Fed.R.Civ.P. 54(b), the clerk shall enter this Order immediately.

II.
IT IS FINALLY ORDERED the Court shall continue to retain jurisdiction of this matter for all purposes.
NOTES
[1] Motions pending raising these issues are as follows: Contempt defendant Reed's motion to dismiss (# 57), filed September 29, 2006; FTC's motion for an order modifying the Permanent Injunction as to defendant Neiswonger (# 72), filed October 20, 2006; and Receiver's Application for Order as to why defendant Reed should not be held in contempt (# 98), filed January 26, 2007.
[2] In connection with this ruling, the Court expressly grants the FTC's motion in limine to admit testimony and exhibits from the deposition of contempt defendant Reed (# 76), filed October 24, 2006.
[3] The Court's recitation of background material, including any specific findings of fact, it considers relevant to the issues before the Court are derived from the hearing transcript(s) of the TRO/Permanent Injunction hearing held on October 25-26, 2006 (# 87 and # 88, filed November 28, 2006); the parties' pleadings; the hearing exhibits, including deposition testimony; and post-hearing briefs. Where necessary, the Court will cite to specific evidence and/or testimony. Where more than one copy of the same exhibit has been filed by different parties, the Court will cite to only one exhibit; however, the reference should not be considered any indication of bias on the part of the Court. Referring to only one of duplicative exhibits is simply a matter of judicial efficiency.
[4] FTC v. Neiswonger, et. al., 4:96CV2225SNL, filed November 13, 1996.
[5] United States of America v. Neiswonger, 4:98CR364RWS.
[6] Colorado v. Reed, 942 P.2d 1204, 1205 (Colo.1997). As of today's date, Reed's law license has not been reinstated.
[7] From all accounts it appears that he served in this capacity during his incarceration.
[8] Paragraph V of the 1997 Permanent Injunction required Neiswonger to procure and provide proof of a $100,000.00 performance bond to the FTC prior to marketing or selling any program.
[9] The evidence indicates that the surety on this bond cancelled same in 2004.
[10] Paragraph XI of the 1997 Permanent Injunction required Neiswonger to inform the FTC, in writing, of any new business affiliation with any program, for a period of three (3) years, commencing in 1997.
[11] $3,089.031.10
[12] There was additional testimony' of the Receiver's representative that these figures may still actually understate the income for the defendants because (at the time of the hearing) APGI's bank accounts had not been fully reconstructed. As of late October 2006, only approximately $1.2 million in receivership defendant accounts had been frozen. Finally, recently, the Receiver has reported to the Court his belief that contempt defendant Reed has engaged in numerous financial transactions in violation of the TRO entered by this Court on July 17, 2006. These allegations are the subject of a motion by the Receiver as to why contempt defendant Reed should not be held in contempt for violation of the TRO (# 98).
[13] FTC Exhibit r; Court Order # 12, filed February 28, 1997.
[14] The FTC has filed a "(proposed) Second Permanent Injunction Modifying Permanent Injunction as to Defendant Neiswonger" (# 72), filed October 20, 2006. Defendant Neiswonger has filed his "(proposed) Second Permanent Injunction Modifying Permanent Injunction as to Defendant Neiswonger" (# 83-3), filed November 8, 2006. Defendant Neiswonger's version is a modification of FTC Document # 72.
[15] Even if Neiswonger had not filed his own proposed version of a second permanent injunction, this Court would have still found that the overwhelming evidence presented at the hearing establishes one or more violations of the 1997 Permanent Injunction by defendant Neiswonger. He clearly failed to notify the FTC of his affiliation with APGI, Inc., a business marketing and selling an "asset protection program". He clearly failed to provide the FTC, in writing, a performance bond in the minimum amount of $100,000.00 prior to the start-up of APGI, Inc. He consistently failed to inform potential customers of material facts relating to his criminal background regarding fraud in a similar business, and the suspension of contempt defendant Reed's law license. He continued to entice potential buyers with advertisements and statements touting "substantial" incomes and/or "six-figure incomes" despite the preclusion of same by the 1997 Permanent Injunction. He failed to inform potential buyers that the "references" were actually paid to provide a good report on APGI; again in direct violation of the 1997 Permanent Injunction. It is this Court's considered opinion that defendant Neiswonger clearly engaged in activities in direct violation of the 1997 Permanent Injunction in order to promote a business scheme similar to the one which gave rise to the 1997 Permanent Injunction and to the criminal charges levied against him in 1998.
[16] Document Nos. # 57 and # 58, filed September 29, 2006.
[17] Reed asserts that he was aware of an "order" but not of a "permanent injunction". His limited deposition testimony was that he was aware that Neiswonger could continue "to sell his products, but there were three restrictions that he had to be careful of . . . Number one, he said he had to keep a bond . . . Number two, he said he was prohibited or couldn't make income claims; and number three, he said that he had to disclose to any prospects that references were paid." FTC Exhibit 104. He claimed that he had no "knowledge" of any injunction because he had never actually seen a document evidencing an injunction.
[18] As for contempt defendant APGI, Ind., since Reed and Neiswonger both had actual knowledge of the 1997 Permanent Injunction, and they were officers of APGI, Inc., the Court finds that such knowledge may be imputed to their corporate business entity.
[19] The FTC is not pursuing a contempt order as to the violation of Section XI; however, this violation, as well as the other documented violations, are the basis of its motion to amend the 1997 Permanent Injunction.
[20] In their motion for an order of civil contempt, the FTC seeks compensatory sanctions, including but not limited to, ordering Neiswonger and Reed to fully disgorge all of the proceeds each obtained from the advertising, marketing, promotion, and sales of the APGI Program. At the time of the filing of the motion, these proceeds amounted to $3,089,031.10 and $4,932,831.86, respectively. However, these amounts may not be accurate since the Receiver was still in the process of ascertaining the assets of APGI, Inc. and the monies in numerous bank accounts accessible to the defendants. Therefore, the Court's civil contempt order, as evidenced by Exhibit I to this memorandum opinion, will not include a compensatory sanction. Instead, the Court will await a final computation from the Receiver, at which time the Court will modify the contempt order to include a compensatory sanction to be levied against any or all defendants.
[21] In fact, the Receiver has pending before this Court (which will be addressed later in this memorandum opinion) a motion seeking an order holding defendant Reed in contempt for violating the freeze on bank accounts entered "by this Court in a TRO. See, Document # 98.
[22] The Court agrees with the FTC that the contempt defendants' contention that "[t]he evidence presented to this Court only relate[s] to consumer sales by Rick Neiswonger and APGI Marketing, Inc." is meritless. The evidence before this Court more than adequately showed Reed's control and active participation in the marketing and sale of the APGI Program through defendant APGI, Inc., which was the company that actually offered to sell the program to consumers.
[23] Kimberly Toy, Joy Roy, Rikki Rowley, and Petra Niederle.
[24] The Court agrees that it is suspect that this "new company" created by Reed bears the same initials/anagram as Assets Protection Group, Inc.; i.e., "APGI".
[25] Reed's "affidavit" is not entitled "Affidavit" but is simply his response with an attestation clause at the end. Furthermore, it fails to meet the requirements of an affidavit in that it is replete with argument, opinion, and hearsay statements. It fails to set forth numbered paragraphs consisting of factual statements reflecting his personal knowledge. The Court will not consider Document # 106 to be a properly filed affidavit but only to be a response to the Receiver's Application for a Contempt Order.
[26] The only other support for Reed's assertions is the "affidavit" of Kimberly Toy which only states that she had been a Vice  President of APGI, that she had been retained as an employee of the Receiver, and that upon review of Reed's response "What the statements made by Reed in the Response are true and correct to the best of her knowledge and belief." Again, this is not a properly submitted affidavit. The factual statements regarding her past employment with APGI and her retention as an employee of the Receiver are meaningless. Furthermore, her incorporation of Reed's response and her belief that his statements are true and correct fail to meet the standard of setting forth factual statements based upon personal knowledge. All she has done is adopt Reed's response. As to his documentary evidence, all three (3) documents fail to adequately challenge the overwhelming evidence submitted by the Receiver. Frankly, their import is lost on the Court as they fail to dispute any of the assertions documented by the Receiver.